Are we ready when you make those? Thank you. I'm talking to my mother-in-law. This is an oral argument, Ms. Gallegos, not a trial, and we will be prepared to case. I apologize for the delay. May it please the Court, my name is Yolanda Gallegos. I represent the plaintiffs at San Juan City College and America Raised Morales. This is an appeal from the November 21, 2006, order of the U.S. Court of Claims, granting summary judgment in favor of the defendants on plaintiff's claim of breach of contract against the U.S. Department of Education. The basis for this claim arose 12 years ago. Did you get reimbursed for the period between February, March, November, and August? The college was ultimately reimbursed for the Pell funds that it had obligated during the period of time that it was unable to participate in Title IV programs. What else is left in this case? As this Court ruled in, I believe, 2004, what else is to be determined is the consequential damages. The course of this case, as you may recall, is that the lower court initially ruled that as a matter of law, the school is not entitled to consequential damages for the breach of contract, and therefore ruled that the issue of breach was irrelevant because the only relief sought at consequential damage were not available as a matter of law. This Court reversed that finding and found that if there was a breach, the plaintiff could obtain consequential damages, assuming those damages could be proven. So what's left in this case is to determine whether there was a breach, and if there was a breach, what damages are available. The relief that we're asking right now is the kind of— What was the breach? The breach was the failure to initiate Subpart G proceedings in this case. Those are the proceedings that are contemplated by the Program Participation Agreement, the contract that governs this case. That's the A3? Subpart G is A3? Subpart G, it's 34 CFR 668, Subpart G. And isn't that applicable where an institution's participation is terminated? Does Subpart G deal with participation terminated? Subpart G are the procedures that the Secretary has designated for the termination of the eligibility of a school to participate. All right. And is that what happened here? Didn't what happened here come under another provision, A1, which says that it is when an institution ceases to provide educational programs, there's automatic termination? The finding of the lower court was that the PPA automatically expired. However, that finding was incorrect. It's a basic term of contract law that if a contract has a termination clause, setting forth the procedures by which a contract is terminated, those procedures are followed. In this case, that was Article 10 of the Program Participation Agreement, which states that when the Secretary terminates a PPA, it does so under the procedures of Subpart G. That was not done in this case, and therefore, the contract is breached. What about the other provision, which says an institution's participation in Title IV ends when it closes or stops providing educational programs, for reasons other than normalization period or natural disaster? That provision deals with the date at which the Program Participation Agreement is to be presumed to have terminated. It deals with the date. So what was supposed to have happened in this case was that the Department of Education should have initiated Subpart G procedures to determine whether 668.26, the provision that you just referred to, that states that participation ends on the date that the school closes, to see if that provision applied in this particular case. And so the purpose of the Subpart G procedures was to make a determination of whether 668.26 applied, whether or not the college actually closed under 668.26. Well, what provision of Subpart G does not comply with this? Excuse me? What portion of Subpart G? You're saying termination shouldn't occur under Subpart G. Correct. What did not occur according to Subpart G? None of it occurred, Your Honor. The Department of Education initiated none of the procedures set forth in Subpart G. It did not issue a notice of intent to terminate. It did not give the school the opportunity to request a hearing. It did not hold a hearing. It did none of the, it carried out none of the procedural requirements for termination. Did you request a hearing? The school was under no duty to request a hearing. What it did do was, at the point at which the contract was breached, the contract was breached at the point at which the Department of Education began to treat the college as a school no longer participating in the Title IV programs. It effectively terminated it. At that point, the contract was breached because it did so without carrying out the procedures for Subpart G. So what it did, so what the college did do was it pointed out the breach. In a May 1995 letter, the college pointed out to the Department of Education that the Subpart G procedures apply, that the department was treating it as a terminated institution without following the Subpart G procedures, and therefore that its actions were illegal and contrary to the pro-participation agreement. What about the automatic termination provisions under the regulations? Where if the institute's program participation agreement is automatically terminated, do you think that it fails to continue the provisions of an educational institution? The Department, excuse me, the lower court's finding that the PPA automatically expires is wrong. The reason why it's wrong is because it is completely contrary to statutory and regulatory standard of the PPA itself. The PPA has no provision for automatic expiration of a contract or automatic termination of a contract. The provision that, the provisions that mention automatic expiration, I believe 668.14, that case, excuse me, that regulation, you know, all it does is set out the date of the effective event that the PPA expired. In other words, what should have happened here was that a Subpart G procedure should have been initiated. The hearing officer should have determined whether or not the school closed under 668.26. If it found that the school had closed under that provision, then the effective date of termination of the PPA would have been the date that it closed, not the date that the hearing officer determined that the college should be terminated from its participation in Title IV programs. Is that clear? What happened in this situation? Are you distinguishing between eligibility for the program and participation in the program? No, Your Honor. That is a distinction, a false distinction that was made by the lower court. The eligibility is the eligibility to participate in the Title IV programs. So when the lower court ruled that the school had closed under 668.26, it made an eligibility determination that was not within its jurisdiction to carry out. It could not, the whole purpose, the whole reason why this case was brought was because the college was deprived of the opportunity to have that issue, whether the school closed under 668.26, brought before a hearing officer as required by the program participation agreement and the regulations incorporated under the terms of the- How did the 640 then play into the structure? Excuse me? Regulation 600.40, plus eligibility. The institution of location ceased to provide educational programs for reasons other than the multiplication of the national disaster. That is similar to 668.26. It said it's, if a hearing officer determines that the school has closed, stop providing educational programs. But that's plus eligibility. That's not plus participation in the program. They are one in the same. They, in order to participate in the Title IV programs, in order to be considered eligible to participate in the Title IV programs, Congress has mandated that this college sign a program participation agreement. This is set out in 20 U.S.C. Section 1094. It's part A, and it states that a college may not participate in the Title IV programs unless, excuse me, a college is not eligible to participate in the Title IV programs, unless it enters into a program participation agreement with the Department of Education. But is it correct to conclude that under the regulations, there's a loss of eligibility and a loss of participation? They're one in the same if you're participating in a contract, that you can lose the contract automatically, but the loss of eligibility is a separate determination that needs to be made? I think they're intrinsically entwined with each other. If the college is, if the college loses its ability to participate in the programs, therefore there is a necessary determination that the school is ineligible. So I think this was a false dichotomy that the lower court created when it, in its decision, stated that it would not consider 34 CFR 600.41, which specifically requires a subpart G proceeding in the very circumstances that this case presents. And is there any obligation for the school to have done anything in terms of notification before a hearing comes into play? That's a very good question. No. I guess, I think I understand what you've been saying. But Judge DiArza and I, I think, have been referring to the provision that says an institution's participation in Title IV program ends on the date that the institution closes or stops providing education programs. Right. And you're telling us that only means a time frame which you later determine in a hearing? I mean, how do you get around, I mean, that to me is pretty clear language. It is clear language. If there were a determination that the college had closed or stopped providing educational programs. So you're saying this doesn't come into play until there's a determination? Absolutely, yes. Well, then how come in Section B, which follows immediately thereafter, it says, if the participation in the program ends, the institution shall immediately notify the Secretary of that fact. That suggests that this is something that happens at the beginning of the continuum, not at the end of the continuum, as you're suggesting. Right. Well, actually, the whole, if you look at the regulatory history of 668.26, the reason why it was set up, and I described this in the brief, and an insight to the Federal Register, the purpose is to set out the obligations of the school when its participation ends in the Title IV program. So, for example. Right, that's exactly what we've been talking about. When the participation, and the participation ends when it stops to provide the services, stops providing the services, and then it's supposed to notify the Secretary and submit a whole variety of information to the Secretary within 45 days after its participation has been terminated. After its participation ends. In this case, the college submits, it did not close or stop providing educational programs. That provision did not apply. And that is the very legal issue that should have been submitted to a hearing officer under the procedures of Subpart G. There's a dispute about whether or not the evidence was closed? I mean, there's a factual dispute? There is a dispute as to whether or not that provision applied. The college does not admit, and has consistently not admitted, and rejects the notion that it closed or stopped providing educational programs within the meaning of 668.26. Is that a legal question or a factual question? It's a legal question as to what the term stops providing educational programs means in this context. If you look at the administrative record and the actions of the Department of Education officials, all of their actions are consistent with the position that the college takes today, and that is that a temporary cessation of classes that are later resumed does not constitute stopping the provision of educational programs under 668.26. Your view is that stopping only applies when it's permitted? So what is your alternative definition? You're saying it would have stopped. What is it? What it is is when a college actually stops providing its program, for example, let's say it has a business administration program, and it's entered into six weeks of its classes, and it stops. And it stops not because it's permitted. It stops. Not for a month, not for a year, not for five years. It's permanent. Yeah, it does not resume the program. Therefore, the students are in a sense ripped off. They didn't get to complete their program. In this case, the students did complete their program. The program did not end. The regulations set up and the actions of the U.S. Department of Education officials in this case are consistent with this interpretation. But it stopped for a period of time. You'll agree with that. You're just saying that a period of time, when it resumes after a period of time, that's not stopping in this provision. Right. Yes. Well, that seems to me, and frankly, I'll say it so that you can tell me why I'm wrong, but it seems to me that's not supported by that sentence in the regulations, which talks about other than a normal vacation period or natural disaster. And the two exceptions it creates are clearly short periods of time, a stop and start period. So I guess I'm having a hard time thinking why we should realize, recognize, or why we should consider this as being permanent. The regulation says that a school's participation ends on the date that it stops providing educational programs other than for a natural disaster or a vacation period. And in that particular case, for example, when a school has its Christmas break, that's a break. The program has completely ended and, therefore, the provision did not apply. If there is a natural disaster, Katrina, the program gets aborted. It does not complete its program because of a natural disaster provision. Normal vacation periods are not always at the end of semester or the end of courses. They're sometimes right in the middle, which is spring break, for instance. Exactly. There's no end to the course. It's in between while the course is ongoing. Right. Every single piece of correspondence in this case that reflects on why the Department of Education reinstated the college to the Title IV programs was because the cessation of classes was temporary and then resumed. Stopping providing educational programs in this context means a permanent cessation of the programs that are not being resumed. And that's- There goes the- Excuse me. We will give you three minutes of rebuttal. Excuse me? We will give you three minutes of rebuttal. Thank you very much. After we hear from the Governor. Thank you. May it please the Court. The regulations that were incorporated into this contract envisioned a variety of ways that a program participation agreement could end. Some of them, of course, involved the Department instituting action determinants. Is there a difference between eligibility and participation? There is, Your Honor. I'm glad you asked that. And of course, the fact that there are two separate sets of regulations that speak to each of those things supports the fact that they are different. But eligibility is determined by the Department. And then if the school is determined to be eligible, it's issued a certificate of eligibility. And students who are deciding where to go to schools where they'll be able to make use of their student loans can apply and know that they are applying to an eligible institution. Participation refers to the schools entering into an agreement with the Department with respect to one or more programs. So participation can end without a school necessarily losing its eligibility. Although eligibility is an initial requirement for a school to participate. So is there a conflict between the subpart D, loss of eligibility, under 600.40 versus 668.26? Is there a conflict? Is there a conflict at the end of an institution's participation? There's no conflict. The regulations dealing with eligibility are consistent with the statute dealing with the loss of eligibility. The regulations dealing with the end of participation are not related to the loss of eligibility because that doesn't speak to the loss of participation. The statute does not really address the program participation agreement other than to say that a school must enter into one and that it must contain certain mandated provisions. Other than that, the statute does not actually discuss or address the duration of the agreement or how it may end. That's a gap that was filled in by the Department of Education in promulgating the regulations that are issued in this case. And the specific regulation, the plain language of 668.14 says at G, an institution's program participation agreement automatically expires on the date back. And it gives two examples. And the first one, which is not an issue in this case but is worth drawing the Court's attention to, says the institution changes ownership that results in a change in control as determined by the secretary. But the second one, which is at issue in this case, says the institution's participation ends under the provisions of 668.26. Notice that the additional language of as determined by the secretary doesn't apply to the situation at issue in this case. 668.14G2, of course, brings into play 668.26A1, which is the circumstance that occurred in this case. The trial court found the school did, in fact, cease to provide educational programs. Where is the hearing requirement? There is no hearing requirement to either of these. The plain language does not speak at all to a hearing requirement to make any kind of determination about whether the circumstances referred to in 668.26A1 have come to pass. So if somebody from the Department of Education goes and for a week when they saw a chain of a block around the doors of the institute, they could come back and say that institute is no longer in operation as an education institution. And based upon that, the secretary could automatically terminate the agreement. Well, the first part of that was exactly right, Your Honor. But based on that, the secretary wouldn't have to terminate the agreement because as this court, as the trial court, I'm sorry, found, the agreement would have automatically ended by virtue of the school stopping. Without a hearing to determine whether or not my vision of that block and key was correct. That's right, without a hearing, Your Honor. I mean- So what does it mean to instance program participation agreement was terminated or expired under 668.14 or under subpart G of this agreement? Under subpart G, that's a very different circumstance. That is when the secretary determines that for some reason it should terminate that agreement. For example, if the school fails to meet its obligations of financial responsibility, the secretary will take, initiate the action to terminate the agreement. In this case, there was no reason for the secretary to initiate the termination because the school, by virtue of closing its doors, ended the agreement. I mean, the department can't force the school to stay in business. Well, they closed the doors wrong, terribly. They closed it because they didn't need money. That's right. They closed it, but it was not for a reason of a scheduled vacation or what would be considered a natural disaster. Is there a requirement for the secretary to at least make a determination as to whether or not that it's a correct condition? They can plant blocks in the doors for other reasons. They could have tried to keep people out, keep students out. Right. The secretary has delegated the authority to follow through on the provisions of 668.26 to the institutional branch chiefs. And we included in the record the delegation of authority. In this case, Mr. McKiernan, who issued the letter to the school notifying it of its obligations under 668.26, was an institutional branch chief with the delegated authority to proceed under section 668.26. And he did exactly that. There was no dispute. In fact, there was no mistake in this case. The school, in fact, had closed for about three weeks. Well, therefore, you answered it just by arson. I mean, this only comes – I agree with you, but this only comes into play if the institution closes or stops providing educational programs. So it doesn't even come into play if it turns out there's a lock on the door and courses were going on and they just locked the door. Exactly. Right. I mean, the participation, the institution, by definition, the participation ends when these factual things happen. That's correct. We don't get the facts. It doesn't even come into play. That's correct. In this case, was there any dispute that at least the institution closed or stopped providing services? No. There was no dispute. That's why it was correctly determined. I was having a judgment. There was no dispute. So that's that. Mr. Stern, you said there's no obligation. What about 20 U.S.C. 1094, Program and Participation Agreements? Under – it wasn't under B. Under C, C-1, which leads us up to F, Limitation, Suspension, or Termination of Participation in Any Program, Subject, etc., have a reasonable notice for an opportunity to hear it. Why doesn't that provide an obligation for the hearing? Because that obligation only arises when there's a secretary that terminates the agreement. When that's the way that the agreement ends. It doesn't apply when the agreement ends by the action of the school. The agreement contemplates clearly that the school did something, was closed, and that action resulted in the end of the agreement. So you're saying when it terminates it, what would be the other sense? When it loses its eligibility, so the secretary terminates it? So you're saying when the institution is open, then the secretary terminates it? Exactly. Are you sure that that's what its application is limited to? Well, again, the plain language of the statute speaks to termination. And termination is a very specific procedure with a lot of regulations that speak to it. But as a counterpoint, we have the other regulations that are at issue here. That's what happens when the school acts. The program participation agreement itself in the Article 10, it clearly recognizes that the agreement may end either at the initiation of the secretary or at the institution. The institution is not somehow enslaved to continue this agreement even after it goes out of business. And the department is not going to prevent the school from going out of business. If the school closes its doors, the agreement ends. That's what the regulations say. And the statute doesn't speak to that situation. And the regulations fill in the gap, as the Department of Regulations authorized to fill in the gaps. Section 668-115, Part H. An institution's program participation agreement automatically expires on the date. So is that fixing the date of expiration, or is that an automatic expiration of the agreement? How should we read that? Again, the entire section of 668.14 is just labeled Program Participation Agreement. And when you look at 668.14G, it talks about, first, the secretary ending it. I'm sorry, F. I'm going to back up to 668.14F. Except as provided in paragraphs H and I, the secretary terminates an agreement by doing a variety of things. But then it says, but an institution may also terminate a Program Participation Agreement. And then it goes on to say, right after that, and the agreement will automatically expire on the date back. So it's sort of setting out a variety of circumstances. The secretary may terminate it. The institution may terminate it. It may end automatically. This situation fell into the automatic ending of that agreement. There was absolutely no evidence that the secretary was acting to initiate the termination. The letter that was sent to me, the school contemporaneously that this happened, the February 14th letter from Mr. McInerney notified the school, we realize that you close your doors. You have obligations once you close your door to follow through, provide us with this financial information. That assumes that the institute was closed. Well, yes. And that's what happens in this case. No, because closure in this case, at least under the regulation, was either closure or a cessation of providing programs, even if it was for a temporary period of time. And the department interprets that regulation as applying to both permanent closures and temporary closures. The language of the regulation supports that interpretation because it does refer to, as Judge Post noticed, vacation periods. One would always hope that the statute of regulations supported an interpretation. Yes. And I believe here that the language of the regulation does support the department's interpretation by referring to closures other than normal vacation periods. And normal vacation periods are, by nature, temporary. That certainly supports the department's position that this includes temporary closures in addition to permanent closures. Going back to the initial question you asked, does this mean that they were no longer eligible to participate? This did not address their eligibility. In fact, they could have, and they were told when they contacted the department in the beginning out of concern for what department, you know, had the department treating them, the department advised them right away, just go ahead and reapply. And there was no indication that there was a problem with the school's eligibility. And if they had quickly simply applied to re-enter the programs, there's nothing in the record to suggest that they wouldn't have been granted it. Eligibility and participation are two different things. And there's nothing in this record to suggest that their eligibility was determined, that they were determined by the department to be no longer eligible. The only thing that happened here, and this is a breach of contract case, and the only thing that happened here is the contract, the agreement between these two parties, ended. But the department not long thereafter reimbursed them for the reimbursement. Yes, several months later the department did end up reimbursing them. The record was not, I would say, entirely clear about why that decision came about, and the trial judge did not reach a determination as to the exact reason it came about. There was some intercession on behalf of the school by a congressman from Puerto Rico. The department issued several letters explaining why the school was taken off the closed school list and saying, we realize you're not closed. But as far as the actions that the department had taken, I would like to direct the court's attention very specifically to a letter from Mr. Morgan, who is the director of compliance for the department. That's on appendix page 142. And Mr. Morgan explains, it's actually a letter to the congressman, he explains, even though the school is not closed, we recognize they're open and we've taken them off our closed school list, basically he says, we did the right thing. Any time a school closes, we don't know if they're going to reopen. We have to protect the public money in this instance, we have to stop the funding, and he doesn't apologize for doing that, he doesn't say that the department was wrong for doing that. And the department was wrong for doing that.  With not only a lock across the doors, but a notice stapled to the door saying that the Puerto Rican tax authority was in there assessing the inventory of the school for possible repossession because it backed taxes, there was no way at that moment for the department of education to know whether this school, or if this school, would ever reopen. And if it continued funneling monies to this school, whether it would ever be able to get those monies back. So the department did the right thing under its regulations. I do want to spend a few minutes. You don't have a few minutes. I don't. You have a minute. I have a minute. Okay. Then quickly, I wanted to say that Judge Post did pick up on this at the beginning of Miss Gallegos' argument, and that is the alternate grounds, which was in this court's initial decision, it recognized that because the school had, in fact, ultimately been reimbursed for all of the funds withheld, in effect, what happened here was merely a delay in payment. And there is nothing in the regulations that speaks to or requires the department to provide a hearing when there's been simply a delay in payment. Was it a, did that include back interest at that point? Actually, I don't know the answer to that, Your Honor. I think out of all the funds that were reimbursed, I don't know if there was any interest provided. And the final point that I want to make, I probably have about ten seconds left at this point, but the court, I think, has also recognized that there was a requirement, even if the court found that they were entitled to a hearing, there was a requirement that the school have requested a hearing. It was undisputed on this record that the school never requested a hearing. And therefore, even if the court would rule against us on all our other arguments, there was no breach because the hearing didn't, they weren't entitled to a hearing until they requested one. And now I see the red light is on, so thank you very much, Your Honor. Thank you, Miss Gallegos. Miss Gallegos has a couple minutes to wrap up. Thank you. There are a couple of things that I need to clarify. First, the issue of whether school stops providing for, closes or stops providing educational programs is most certainly an eligibility issue. Under 34 CFR section 600.41, the provision reads, in cases where the secretary believes that a previously designated eligible institution, Which provision is 600.41? 41A1g. The board secretary believes that a previously designated eligible institution does not satisfy the statutory or regulatory requirements that define the institution as an eligible institution, including instances where the belief is that the school has lost eligibility for, and I quote, ceasing to provide educational programs for a reason other than a normal vacation period or natural disaster that directly affects the institution, a particular location for the students at the institution or location. It clearly is an eligibility issue. In fact, the lower court acknowledged this in its ruling when it stated that one of the reasons why it considered the PPA to have automatically expired is because under subsection 2A, Article 10, subsection, paragraph 2A. In that section, the PPA states that the PPA terminates when the school loses its eligibility. But the school does pay, doesn't it? I think, of course, I'll ask this question as we answer it, but I'll keep that answer. What do you expect to get out of this breach of contract action when the school's been paid? The school was paid for the health funds that it obligated and committed to its students, but it was not paid in consequential damages for the period of time where it was not able to receive federal funds, funds which it relied upon as a for-profit institution to operate. But what were the consequential damages? It's lost profits for the period of time that it did not receive the type of funding. What did it get repaid for? It got paid for, all it got was the federal funds that it committed to its students for tuition and charges. Under the Higher Education Act, the Pell Grant Program, which was the only program that this college was participating in at the time, students had applied for and were eligible for Pell Grant funds. So those funds were committed by the college and advanced in the form of tuition and charges to the college. So the colleges, in essence, fronted those Pell Funds for the students. Five months after the Department of Education had terminated the college's participation in the Title IV programs by cutting it off the Title IV funding, and there is no dispute that the Department of Education's actions that caused the school to be unable to participate in the Title IV programs, it issued a closed school letter, it put it on the closed school list, it issued a freeze memorandum that prevented it from drawing down funds, it issued a stop order that prevented it from having its reimbursement request processed. Is there a final point you wish to make? Just that the... Just can I ask you a question? Sure. Is that four-month period lost profits for that four-month period? Is that the consequential damages that were incurred for that five-month period? Well, it's for the damages that were incurred as a result of it not being able to receive funding for those five months. But you were paid back for those five months. Yeah, but the school ultimately closed because it was unable to meet its obligations. So... How many years later? No, it closed a few months later, a few weeks later. I believe it was in... The school was reinstated into the Title IV programs in July of 1995, and I don't remember the exact date, but I think it might have been February of 1996 when the school closed for good. And in the meantime, it lost its students and it damaged its reputation. Thank you, Ms. Correa. Those, I think, are the case. Case, would you say, on desire?